UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**RONNIE DUNCAN**, an individual,

      Plaintiff,

v.

**DETROIT TELEVISION STATION WKBD INC., CBS BROADCASTING INC., & PARAMOUNT GLOBAL**, Foreign Profit Corporations,

      Defendants.

_____/

Case No.

**JURY TRIAL DEMAND**

## COMPLAINT

Plaintiff RONNIE DUNCAN ("Mr. Duncan" or "Plaintiff") brings this action against DETROIT TELEVISION STATIONS WWJ-TV/WKBD-TV INC. ("CBS Detroit"), CBS BROADCASTING INC. ("CBS Stations") & PARAMOUNT GLOBAL ("Paramount") (collectively "Defendants") to remedy his unlawful termination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e17 (as amended) ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Breach of Contract And Promissory Estoppel claims.

Relying upon Defendants' promises that he could voice opposition to CBS Detroit's differential treatment of African American employees, Plaintiff formally raised the issue of CBS Detroit's discriminatory hiring and advancement practices.

Subsequently, despite repeated assurances against retaliation, Defendants breached their promises and ginned up a bogus reason for terminating his employment, thereby violating his statutory and common law rights.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, as this action involves federal questions regarding violations of Plaintiff's rights under Title VII and Section 1981. A copy of Plaintiff's Right to Sue Letter is attached as **Exhibit ("Ex.") 1 – EEOC Right to Sue Letter**.

2. This Court also has diversity jurisdiction as the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

3. This Court has supplemental jurisdiction over Plaintiff's ELCRA, Breach of Contract, and Promissory Estoppel claims pursuant to 28 U.S.C. § 1367, as these claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because CBS Detroit regularly conducts business within this District and employed Plaintiff therein, and because Plaintiff resides in this District where the substantial part of the events giving rise to these claims occurred.

## PARTIES

5. Mr. Duncan is a former employee of CBS Detroit residing in this District at all relevant times.

6. Upon information and belief, all Defendants were joint employers of Plaintiff:

   i. CBS Detroit is a foreign corporation that produces local daily news programming from its 26905 W. Eleven Mile Road, Southfield, MI 48033 facility. CBS Detroit also carries programming created by CBS Stations.

   ii. CBS Stations is a national entity and the news division of Paramount Global. CBS Stations is a foreign corporation with its resident agent located in Lansing, Michigan. CBS Stations owns and operates CBS Detroit. CBS Stations provides resources and services, such as financing and recruiting, for its local news stations, including CBS Detroit. CBS Stations maintains substantial control over CBS Detroit and oversees its overall direction.

   iii. Paramount is a national media company that serves customers worldwide by producing news and entertainment content through its network of studios and talent. Paramount is a foreign corporation with its Principal Executive Office located at 1515 Broadway, New York,

NY, 10036. Paramount is CBS Stations' parent company and maintains ultimate authority over personnel decisions and operational oversight at both CBS Stations and CBS Detroit. Like his peers at CBS Detroit, Plaintiff had a "@paramount.com" email address.

## STATEMENT OF FACTS

7. Mr. Duncan is an African American, proud of his lifelong civil rights advocacy.

8. Mr. Duncan's storied broadcasting career includes multiple Emmy nominations, writing and producing an award winning sports documentary, winning the Broadcasters Association's "Best Sports Anchor" award, the Associated Press's "Best Sports Coverage" award, and hosting an exclusive interview with Governor Rick Snyder regarding the Flint Water Crisis.

9. In 2022, Laurie Orlando ("Ms. Orlando"), Senior Vice President of Talent Strategy for CBS Stations, interviewed Mr. Duncan for a local news position in Detroit, identifying Boston as another potential market for his consideration

10. Ms. Orlando represented that Mr. Duncan was an excellent candidate for either local market CBS Stations was committed to having its local newsroom talent "look" like the targeted local market = *i.e.*, greater on-air African American representation in African American markets.

4

11. CBS Stations objectives were aligned with Mr. Duncan's personal beliefs, and he accepted an oral offer of employment at CBS Detroit.

**CBS Detroit Stalls Mr. Duncan's Formal Offer of Employment.**

12. The offer remained pending for an extended period of time, purportedly awaiting final approval from CBS Detroit. Frustrated with the delay and unwilling to forego other opportunities. Duncan contacted Ms. Orlando and informed her he was withdrawing his name from consideration.

13. Ms. Orlando asked him to reconsider, assuring him an offer would be extended the next business day.

14. Ms. Orlando represented CBS Detroit's management's delay was unrelated to his skills or qualifications. Rather, his versatility provided them flexibility with determining his ultimate role with the station.

15. During their discussion, Ms. Orlando and Mr. Duncan addressed the systemic barriers facing African American talent in television news, expressing mutual commitment to transform the industry from exclusion to meaningful diversity and inclusion.

16. After having this conversation, Mr. Duncan agreed not to withdraw his name from consideration.

17. On July 28, 2022, Mr. Duncan and CBS Detroit entered into a three-year agreement (the "Contract") for Mr. Duncan to become CBS News Detroit's Sports Anchor and Reporter. **Ex. 2 – Employment Agreement**.

18. The Contract's terms limit the reasons Defendants may terminate Mr. Duncan. *See id.*, Sections 7, 13.

**CBS Detroit's Discriminatory Practices Towards African Americans.**

19. Initially, CBS Stations' stated goals of inclusion and diversity aligned with CBS Detroit management's public messaging promoting CBS Detroit.

20. In an interview to NewscastStudio, a trade publication, CBS Detroit News Director Paul Pytlowany ("Mr. Pytlowany") remarked, "[i]f we look like everyone else, we've failed . . . . It's really neighborhoods to newsrooms instead of newsrooms to neighborhoods."[1]

21. In a promotional video, CBS Detroit marketed itself as being less news about deadly crime in Detroit and more about positive stories that matter to its market viewers.[2]

22. While on the outside, CBS Detroit promoted a commitment to diversity, behind the scenes, Mr. Duncan observed a pervasive pattern of race-based differential treatment.

---

[1] https://www.newscaststudio.com/2023/01/23/cbs-news-detroit-launch-newscasts/ (last accessed December 29, 2024).
[2] *See id.* embedded YouTube video (last accessed December 29, 2024).

23. Mr. Duncan observed that management delayed extending offers to qualified African Americans applicants to discourage African Americans' continued interest in positions. Instead, less qualified Caucasian applicants were hired.

24. Mr. Duncan watched as CBS Detroit hired Africans Americans for janitorial positions but never hired a single African American for a Sales position.

25. Similarly, Mr. Duncan observed members of management at CBS Detroit promulgate race-based stereotypes and engage in racially offensive conduct. Specifically, a member of management once compared a gorilla's lips to an African American employee's lips at CBS Detroit.

26. With respect to the content aired, Mr. Duncan watched as CBS Detroit's management repeatedly rejected "positive" stories regarding African Americans but promoted positive stories involving Caucasians.

27. Because of his decades of experience and stature within the broadcasting community, CBS Detroit often referred to Mr. Duncan as "our newsroom leader,"[3] and employees often came to him to vent, seek guidance, or ask for assistance.

28. For example, one African American employee approached Mr. Duncan seeking guidance because CBS Detroit paid him less than it did his less qualified

---

[3] Even CBS Detroit's management used this term to proudly describe Mr. Duncan when CBS Stations executives visited.

7

Caucasian co-worker, even after the employee raised the issue to CBS Detroit's President and General Manager, Brian Watson ("Mr. Watson").

**Mr. Duncan Advocates About the Racism at CBS Detroit.**

29. Around the time of his one-year anniversary, Mr. Duncan expressed concern regarding the station's lack of diversity to Mr. Pytlowany, Newsroom Director. Thereafter, Mr. Pytlowany distanced himself from Mr. Duncan.

30. Shortly thereafter, Mr. Duncan expressed his concerns to Ms. Orlando, that CBS Detroit's hiring practices were discriminatory against African Americans.

31. Ms. Orlando instructed Mr. Duncan to memorialize his complaints in an email to her and top brass at CBS Stations. Mr. Duncan expressed fear of retaliation, but Ms. Orland assured him Defendants would not retaliate against him.

32. As a result of Ms. Orlando's assurance, Mr. Duncan memorialized his complaints in an August 20, 2023, email to CBS Stations' executives, stating, in relevant parts:

> As an African-American, I find it disappointing to work in a Newsroom where no-one of color sits at the table that can make comments or contribute toward the editorial direction of our daily content.
>
> What is also equally disheartening is the fact that I work in a city that is more than 75 percent African – Americans; and no one of color is represented in our Sales staff.
>
> This appears odd to me when I consider a CBS philosophy often echoed by many corporate leaders of this company that speak on values of diversity.

> It appears that several times many candidates for hire have even given up waiting to hear back from local management or [sic] pass over in favor of someone with little or no experience.
>
> I've never worked in a newsroom in over 40 years where my scripts or that of my colleagues are not approved.

33. Within days of his e-mailed complaint, management at CBS Detroit began alienating Mr. Duncan. During this same timeframe, Ms. Orlando advised Mr. Duncan that Mr. Watson would be contacting him regarding his concerns. Shortly thereafter, Mr. Watson and Mr. Duncan had a brief initial meeting regarding the general nature of Mr. Duncan's concerns. The meeting was short and professional, and the two men agreed to meet again to discuss Mr. Duncan's complaints in greater depth.

34. During the second meeting with Mr. Watson, which occurred in September 2023, Mr. Duncan provided specific examples of what he believed to be discriminatory practices, and expressed concern that CBS Detroit was discriminating against African Americans in hiring and on-air opportunities. Mr. Watson became angry and defensive, and appeared to take personal offense to Mr. Duncan's allegations.

35. As Mr. Duncan originally feared, having witnessed Mr. Watson's reaction to his complaints, Mr. Duncan surmised there was a very strong likelihood of retaliation. Mr. Duncan immediately contacted Ms. Orlando to apprise her of the meeting with Mr. Watson and his concern that he would be targeted for retaliation.

**Mr. Duncan is Terminated.**

36. Within months, Mr. Duncan's fears were realized. In October 2023, a Human Resources representative from Paramount advised Mr. Duncan he was under investigation for sexual harassment.

37. Certain of his innocence, Mr. Duncan fully cooperated with the HR investigation because the allegations against him were nothing more than efforts to weaponize sexual harassment protocols in retaliation for his opposing race discrimination at CBS Detroit.

38. The allegations of harassment were bogus, and Defendants discriminatorily applied policies and procedures to reach a contrived outcome – termination.

39. On December 14, 2023, Defendants terminated Mr. Duncan's employment.

40. Mr. Duncan was replaced by an individual outside his protected status and was provided with better terms and conditions of employment than those provided to Mr. Duncan.

**COUNT I – RETALIATION IN VIOLATION OF TITLE VII**

41. Plaintiff re-alleges Paragraphs 7 to 40 as if set forth fully herein.

42. Plaintiff engaged in protected activity by opposing Defendants' discriminatory conduct, which he believed violated Title VII.

43. Plaintiff's protected activity was known to Defendants.

44. Defendants retaliated against Plaintiff for engaging in protected activity by changing the terms and conditions of his employment and orchestrating a sexual harassment investigation to terminate his employment.

45. Defendants used the bogus sexual harassment investigation as "cover" for retaliation in violation of Title VII. The investigation and outcome were pretext for illegal retaliation.

46. As a direct result of the wrongful termination, Plaintiff has suffered damages including, but not limited to, lost past and future income and benefits, and emotional distress.

47. Plaintiff seeks punitive damages as well as attorneys' fees and costs to the maximum extent provided under law.

### **COUNT II – RETALIATION IN VIOLATION OF § 1981**

48. Plaintiff re-alleges Paragraphs 7 to 40 as if set forth fully herein.

49. Plaintiff engaged in protected activity by opposing Defendants' conduct by advocating for the contractual rights African Americans at CBS Detroit to enjoy the full and equal benefit of all laws and proceedings.

50. Plaintiff's protected activity was known to Defendants.

51. Defendants retaliated against Plaintiff for engaging in protected activity by changing the terms and conditions of his employment and orchestrating a sexual harassment investigation to terminate his employment.

52. Defendants used the bogus sexual harassment investigation as "cover" for retaliation in violation of § 1981. The investigation and outcome were pretext for illegal retaliation.

53. As a direct result of the wrongful termination, Plaintiff has suffered damages including, but not limited to, lost past and future income and benefits, and emotional distress.

54. Plaintiff seeks punitive damages as well as attorneys' fees and costs to the maximum extent provided under law.

## **COUNT III – RETALIATION IN VIOLATION OF THE ELCRA**

55. Plaintiff re-alleges Paragraphs 7 to 40 as if set forth fully herein.

56. Plaintiff engaged in protected activity by opposing Defendants' discriminatory conduct, which he believed violated the ELCRA.

57. Plaintiff's protected activity was known to Defendants.

58. Defendants retaliated against Plaintiff for engaging in protected activity by changing the terms and conditions of his employment and orchestrating a sexual harassment investigation to terminate his employment.

59. Defendants used the bogus sexual harassment investigation as "cover" for retaliation in violation of the ELCRA. The investigation and outcome were pretext for illegal retaliation.

60. As a direct result of the wrongful termination, Plaintiff has suffered damages including, but not limited to, lost past and future income and benefits, and emotional distress.

61. Plaintiff seeks compensatory damages as well as attorneys' fees and costs to the maximum extent provided under law.

**COUNT IV – RACE DISCRIMINATION IN VIOLATION OF TITLE VII**

62. Plaintiff re-alleges Paragraphs 7 to 40 as if set forth fully herein.

63. Plaintiff was treated less favorably than similarly situated individuals outside his protected class and was subjected to different terms and conditions of employment based on his race.

64. Plaintiff was terminated. As a direct result of the wrongful termination, Plaintiff has suffered damages including, but not limited to, lost past and future income and benefits, and emotional distress.

65. Plaintiff seeks punitive damages as well as attorneys' fees and costs to the maximum extent provided under law.

**COUNT V – RACE DISCRIMINATION IN VIOLATION OF § 1981**

66. Plaintiff re-alleges Paragraphs 7 to 40 as if set forth fully herein.

67. Plaintiff was treated less favorably than similarly situated individuals outside his protected class and was subjected to different terms and conditions of employment based on his race.

68. Plaintiff was terminated. As a direct result of the wrongful termination, Plaintiff has suffered damages including, but not limited to, lost past and future income and benefits, and emotional distress.

69. Plaintiff seeks punitive damages as well as attorneys' fees and costs to the maximum extent provided under law.

70. Plaintiff seeks punitive damages as well as attorneys' fees and costs to the maximum extent provided under law.

**COUNT VI – RACE DISCRIMINATION IN VIOLATION OF THE ELCRA**

71. Plaintiff re-alleges Paragraphs 7 to 40 as if set forth fully herein.

72. Plaintiff was treated less favorably than similarly situated individuals outside his protected class and was subjected to different terms and conditions of employment based on his race.

73. Plaintiff was terminated. As a direct result of the wrongful termination, Plaintiff has suffered damages including, but not limited to, lost past and future income and benefits, and emotional distress.

74. Plaintiff seeks compensatory damages as well as attorneys' fees and costs to the maximum extent provided under law.

## COUNT VII – BREACH OF CONTRACT AGAINST DEFENDANTS

75. Plaintiff re-alleges Paragraphs 7 to 40 as if set forth fully herein.

76. The Contract provided that Defendants could only terminate Plaintiff's employment for cause.

77. Plaintiff did not engage in any underlying conduct that would be "cause" under the Contract.

78. As such, Defendants breached the Contract by terminating Plaintiff's employment.

79. Plaintiff suffered damages as a result of Defendants' breach.

## COUNT VIII – PROMISSORY ESTOPPEL CLAIM

80. Plaintiff re-alleges Paragraphs 7 to 40 as if set forth fully herein, and further states, in the alternative, the following:

81. Defendants made one or more clear and definite promises to Plaintiff that he would not be retaliated against if he formally memorialized and/or discussed his complaints of race-based differential treatment with Defendants.

82. Defendants knew or should have reasonably expected that this/these promise(s) would induce Plaintiff to formally memorialize and/or discuss his complaints of race-based differential treatment with Defendants.

83. Plaintiff memorialized and/or discussed his complaints of race-based differential treatment because he relied on Defendants' promise(s) that he would not be retaliated against.

84. Plaintiff suffered damages as a result of his reliance.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including, but not limited to, an award of back pay and loss of benefits through the date of trial and front pay and future loss of benefits if the equitable remedies of employment, reinstatement and promotion are not feasible;

B. An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all compensatory damages, including, but not limited to, an award of emotional distress caused by Defendants' unlawful conduct;

C. An award of punitive damages in an amount to be determined at trial;

D. Prejudgment interest on all amounts due;

E. An award of Plaintiff's reasonable attorneys' fees and costs; and,

  F. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: December 30, 2024

            Respectfully submitted,

            **MORGAN & MORGAN, P.A.**

           By: */s/ Ertis Tereziu*
            **Ertis Tereziu, Esq.** (P84911)
            2000 Town Center, Suite 1900
            Southfield, MI 48075
            Tel: (313) 739-1953
            etereziu@forthepeople.com

            **Marc Edelman, Esq.**
            **FL. Bar No. 0096342**
            (*pro hac vice* forthcoming)
            201 N. Franklin Street
            Suite 700
            Tampa, FL 33602
            Tel: (813) 577-4722
            medelman@forthepeople.com

            *Attorneys for Plaintiff*